## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

*******************************************

UNITED STATES OF AMERICA,

Case No.:       1:22-CR-69 (GLS)

     v.

KEVIN SMURPHAT,

               Defendant.

*******************************************

## GOVERNMENT'S RESPONSE TO DEFENDANT'S
## MOTION TO SUPRESS EVIDENCE

Dated:    December 16, 2022

Respectfully submitted,


CARLA B. FREEDMAN
United States Attorney

By:       _/s/ Dustin C. Segovia_
Dustin C. Segovia
Assistant United States Attorney
Bar Roll No. 703016

## TABLE OF CONTENTS

I.    INTRODUCTION…………………………………....…………………………………1

II.   FACTUAL BACKGROUND………………………………………………………......1

    A.  Smurphat's Performance on Supervision Leading up to November 2020……………......2

    B.  Smurphat's Conditions of Release Limited the Devices he Could Permissibly Access and Provided Parole Authority to Search any Devices he Could Access…..…………………3

    C.  Smurphat's Parole Officer Discovers Child Pornography on an Unauthorized Cellphone during a Home Visit ……………………………..…………………….………………......5

    D.  Smurphat's Interview at the State Police Barracks…………….…………………….........6

    E.  The Federal Search Warrants Obtained as Part of the FBI's Investigation into Smurphat……………………..…………………………..…………………….........8

III.  ARGUMENT…………………………………………………………….......………..11

    A.  The Search of the Phone was Permissible Under the Conditions of Smurphat's Supervision…………….……………………….…………………………………….…..11

    B.  Smurphat Abandoned any Privacy Interest in the Phone When he Disclaimed Ownership of it Immediately Before his Parole Officer Searched it.. ……………..…………….......15

    C.  Smurphat Consented to the Search of the Phone……..…………………………..………....16

    D.  The Federal Search Warrant for the Phone Provided an Independent Source Justifying its Search. ……………………………………………………………………………...……18

    E.  Application of the Exclusionary Rule is Not Warranted in This Case …..………………19

V.    CONCLUSION………………………………………………………………….......20

## I.    INTRODUCTION

While on parole for a sex offense involving a seven-year-old child, Defendant Kevin Smurphat was found in possession of an unauthorized cellphone that was searched by his parole officer pursuant to conditions, by NYSP with his consent, and by the FBI with a warrant. Smurphat seeks to suppress the evidence discovered on the cellphone and in an online storage account discovered through the search of the phone.  Dkt. 21.  His motion, however, falls short for any or all of the following reasons, each of which, standing alone, affords a sufficient basis to deny the motion: (1) the search of the contraband phone was permissible under the conditions of his release; (2) he abandoned any privacy interest in the phone at the time it was searched by his parole officers when disclaimed ownership of it; (3) he consented to a search of the phone; (4) even without the information learned by the parole officers and NYSP, the federal search warrant for the phone was supported by probable cause (or could be relied on in good faith); and (5) even assuming some violation of Smurphat's Fourth Amendment rights occurred, the circumstances do not justify application of exclusionary rule in this case.

## II.    FACTUAL BACKGROUND

In November 2020, Kevin Smurphat, on state parole for a sex offense involving a minor, was visited by parole officers at the motel where he was residing.  Gov. Ex. 1 (Certificate of Conviction); Def. Ex. B (Supporting Deposition by Parole Officer Wendy Brown); Gov. Ex. 3 (Miranda Form and Statement of Kevin Smurphat); Gov. Ex. 4 (New York State Complaint); and Gov. Ex. 5 (State Violation Charge Sheet and Summary).  They encountered Smurphat alone in his single-occupancy room and observed a cell phone that he was not permitted to have under the conditions of his supervision.  Def. Ex. B; Gov. Ex. 5 at 5, 6.  Smurphat denied that the phone belonged to him, but he provided the passcode, and his parole officer searched the device, locating

child pornography.  Def. Ex. B; Gov. Ex. 5 at 5-6.  The New York State Police (NYSP) were contacted and later the same day, Smurphat incriminated himself in post-*Miranda* statements while at the police department. Gov. Ex. 2 (Video Recorded Interview); Gov. Ex. 3.  Smurphat also consented to a search of the cell phone and again provided the passcode.  Gov. Ex. 2.  Charges for violating his parole followed, as well as new, state criminal charges.  Gov. Ex. 4; Gov. Ex. 5 at 1-2.  Later, after the FBI became involved in the case, federal search warrants for the cell phone recovered by state parole and for an online storage account linked to Smurphat were obtained, Def. Ex. E. The online storage account contained child pornography, as did the cell phone, which also revealed communications between Smurphat and others discussing their sexual interests in children and exchanging child pornography, both of which form the basis of the federal charges pending against Smurphat.  Gov. Ex. 5 at 5. Dkt. 1 (Federal Indictment).

    A.  <u>Smurphat's Performance on Supervision Leading up to November 2020.</u>

Smurphat was placed on parole after a 2009 conviction for Attempted First Degree Sexual Abuse, in violation of NY Penal § 130.65(3), after he "attempted to subject a 7-year old female to unwanted sexual contact by attempting to touch her breasts."  Gov. Ex. 1 at 1; Gov Ex. 5 at 3.  He was initially sentenced to six months' imprisonment and 10 years of supervision, but in June 2010, he "violated his terms of supervision by having contact with minors without permission, left the County without permission, and found to possess a computer that contained pornographic materials."  Gov. Ex. 5 at 3.  He was then sentenced to three years' imprisonment followed by 10 years of "Post-Release Parole Supervision."  Gov. Ex. 1 at 1.

After being released, Smurphat again violated his conditions in December 2012 "after he was found to be in possession of a knife, used the internet without permission, and possessed children's underwear."  Gov. Ex. 5 at 3.

He violated his conditions yet again in January 2018 "after he was found [] with a smart phone device with internet capabilities, had prohibited contact with a female, and had in his possession children's underwear." *Id*.   His most recent period of supervision commenced after he was released from incarceration in September 2020.  Def. Ex. B.

B. Smurphat's Conditions of Release Limited the Devices he Could Permissibly Access and Provided Parole Authority to Search any Devices he Could Access.

In September 2020, Smurphat's conditions of parole were reviewed with him by his parole officer, and he signed multiple certifications indicating that he understood them. Def. Ex. B at 1. Those conditions repeatedly informed Smurphat that he was subject to visitation at his residence, that there were limitations on his ability to possess electronic devices, and that his residence and personal property, including electronic devices to which he had access, were subject to search.

Smurphat's "Conditions of Release" issued by the New York Department of Corrections and Community Supervision (DOCCS) specifically included the following conditions:

1.    "I will permit my Parole Officer to visit me at my residence, will permit the search and inspection of my person, residence, and property . . ." Def. Ex. A at 2.

2.    "I will NOT own, use, possess, purchase or have control of any computer, computer related material, electronic storage devices, communication devices, and/or the internet, unless I obtain prior written permission from the PAROLE OFFICER. Furthermore, if approved: If I am permitted by the PAROLE OFFICER to possess a computer at my residence, permission will be granted for only one computer." Def. Ex. A at 3.

3.    "I will NOT attempt to circumvent, alter, inhibit, or prevent the functioning of any monitoring or limiting equipment, device or software that has been installed by or at the behest of, or is being utilized by, the Department of Corrections and Community Supervision for the purposes of recording, monitoring or limiting my computer or internet use and access, nor will I tamper with such equipment, device or software in any way." *Id*.

4.    "I will cooperate with unannounced examinations directed by the PAROLE OFFICER of any and all computer(s) and/or other electronic device(s) to which I have access. This includes access to all data and/or images stored on . . . cell phones, and/or any other storage media whether installed within a device or removable. I

will install or allow to be installed, at my own expense, equipment and/or software to monitor or limit computer use." *Id*.

5.    "I will submit to photo imaging every 90 days or whenever directed by the PAROLE OFFICER or other representative of the NYS Department of Corrections and Community Supervision." *Id*.

Smurphat signed the document listing the above conditions, certifying that he had read and understood the conditions. Def. A at 3.

A document labeled "Special Conditions of Release to Parole Supervision," restated the first four conditions identified above, reiterating to Smurphat that he, his residence, and any devices he had access to were subject to search and monitoring. Def. Ex. C. Smurphat signed that document, again certifying that he had read and understood the conditions. *Id*. at 1.

An additional document also labeled "Special Conditions of Release to Parole Supervision" identified the following conditions:

1.    I will NOT be in the possession of, or rent, any computers such as a desktop, laptop, computer game console, an hand held devices that can double as a computer, blackberry's, ipod's, ipad's or anything with the capability of accessing the internet, and Wi-Fi capabilities, without the prior knowledge and permission of my Parole Officer." Def. Ex. D at 2 (emphasis in original).

2.    "I will NOT engage or participate in any on-line computer services that involve the exchange of electronic messages or establishes sexual encounters or liaisons." *Id*.

3.    "I will not purchase or possess photographic or video equipment, in addition to cell phone camera's, without the prior knowledge or permission of my Parole Officer." *Id*.

4.    "I will submit to photo imaging every 90 days or whenever directed by the PAROLE OFFICER or other representative of the NYS Department of Corrections and Community Supervision." *Id*. (identical to fourth condition identified above from Def. Ex. A).

As with the other two documents, Smurphat signed the document outlining these conditions, certifying yet again that had read and understood the conditions. Def. Ex. D at 4.

Additional conditions tailored towards preventing Smurphat from re-offending and oriented towards protecting children were also imposed, including that Smurphat was not permitted to (1) have contact with any minor without the permission of his parole officer, Def. Ex. A at 2; Def. Ex. D at 1; (2) associate or communicate with the victim of Smurphat's sex offense, Def. Ex. A at 2; Def. Ex. D at 1; (3) communicate with others "for the purpose of promoting sexual relations with persons under the age of eighteen," Def. Ex. A at 2; (4) communicate with minors over the internet, Def. Ex. A at 2-3; (5) patronize "internet café's or child themed restaurants" or be within 1,000 feet "of places where children congregate," including schools, playgrounds, malls, etc. without his parole officer's approval, Def. Ex. D at 1, 2; (6) possess children's toys, books, or clothing, or cut out pictures or photos of minors, *id*. at 2, 3; and (7) that he would register a sex offender, *id*. at 3.

C.   Smurphat's Parole Officer Discovers Child Pornography on an Unauthorized Cellphone during a Home Visit.

On November 8, 2020, Parole Officer Wendy Brown, who is responsible for supervising Smurphat, along with two fellow parole officers went to Smurphat's residence at approximately 7:20 a.m.  Def. Ex. B.  In Smurphat's single-occupancy room where he was the only resident, they located an unauthorized smart phone on the bed.  *Id.*; Gov. Ex. 5 at 5-6.  Smurphat disclaimed ownership of the smartphone but "was unable to account for whose phone it could [] belong to, as he lived alone in a single room occupancy."  Gov. Ex. 5 at 6.  When asked for the passcode, he provided it to the parole officers.  *Id*.

PO Brown searched the phone and discovered that (1) the device "had Wi-Fi capabilities, an operable camera and video recording capabilities, and several messaging and social media applications, such as Facebook and Kik"; (2) an unregistered email address had been used on the device; (3) searches for "sissy bra" and "cute training bra," among others, had been conducted; (4)

pornography from "Pornhub" had been accessed on the internet; and (5) depictions of sexual conduct involving children under 16 were on the phone and additional child pornography was found in the "Dropbox" application (Dropbox is an online storage service with a mobile application). Gov. Ex. 4 at 1; Gov. Ex. 5 at 5. DOCCS issued a "Charge Sheet" alleging violations stemming from the above discoveries, among others, and seeking the issuance of a warrant. Gov. Ex. 5 at 1-2. Smurphat was transported to the NYSP Barracks in Granville, New York, where he was interviewed by NYSP Investigator Kevin Reppenhagen. Gov. Ex. 5 at 6; Gov. Ex. 4 at 1.

     D. <u>Smurphat's Interview at the State Police Barracks.</u>

The interview began around 9:22 a.m. and lasted approximately an hour. Gov. Ex. 2. Smurphat, who had one hand handcuffed to something affixed to the wall, was read his *Miranda* rights, indicated he understood those rights, and answered questions thereafter. *Id*. at 5:00-5:33. The interview began with a discussion of Smurphat's conditions and after Smurphat noted that he was subject to "more than a hundred" conditions of release, *id.* at 5:36-5:50, the following exchange occurred:

| | |
|---|---|
| Inv. Reppenhagen: | Let's narrow it down. |
| Smurphat: | Okay. |
| Inv. Reppenhagen: | What are the conditions that you are in here for today? You're not supposed to have a what? |
| Smurphat: | A phone. |
| Inv. Reppenhagen: | A phone. Ok so, you're not supposed to have any phone or just a smartphone? |
| Smurphat: | I'm not supposed to have a phone that is not approved by parole. |
| Inv. Reppenhagen: | Okay. So, how often do they come and do supervised checks? |
| Smurphat: | Random. |
| Inv. Reppenhagen: | Okay. Prior to today when was the last time they came? |

Smurphat:          Don't know. I don't really keep track.

*Id.* at 5:55-6:30. During the course of the interview that followed, Smurphat made incriminating admissions that culminated in his signing a written statement in which he made admissions about the child pornography found on the phone. Gov. Ex. 2; Gov. Ex. 3 at 1-2.

Later in the interview, Inv. Reppenhagen, noting that Smurphat had been cooperative, presented Smurphat with a consent form to have his phone downloaded. 15:00-15:25. When he asked for the password, Smurphat initially declined to provide it. 15:26-15:45. At that point, Inv. Reppenhagen explained that he would get into the phone either way, to which Smurphat responded, "I know you already are." *Id*. at 15:45-15:50. Inv. Reppenhagen then explained that it would present better to the district attorney's office and the court if Smurphat was cooperative, that he had already given authorization through his parole conditions to review it, and that the investigators could get a warrant, but that Smurphat's consent would spare them from having to do so. *Id.* at 15:50-16:45. Inv. Reppenhagen again asked for the passcode, and after Smurphat provided it, Inv. Reppenhagen began reviewing the phone. *Id.* 16:45-18:00. About ten minutes later, Inv. Reppenhagen read a consent to search form to Smurphat and explained the process that would be followed to review the phone. *Id.* at 27:45-29:10. He then began to provide the form to Smurphat for his review and signature when Smurphat asked, "So I give consent to search, then what?" and Inv. Reppenhagen explained, that it would be downloaded and Smurphat would eventually be charged with possession of child pornography, but that he did not believe Smurphat would be charged that day. *Id.* at 29:10-30:00. Smurphat then began reviewing the form, stopping at one point when he saw a portion of the form that had not been read, and handed the form back to Inv. Reppenhagen, who then read out loud from the form, "I fully understand that I don't have to consent to the search. No promises threats or intimidation were used." *Id*. at 30:00-31:20. While

appearing to sign the form, Smurphat said, "So, you've already seen it so I know you can charge me today. And you're choosing not to?" to which Inv. Reppenhagen responded, "No." Smurphat then stated, "I appreciate that. I do," and Inv. Reppenhagen responded, "Well I appreciate you being cooperative, you know. It goes a long way." *Id.* at 31:20-31:36.

At the end of the interview, Smurphat provided a phone number where Inv. Reppenhagen could reach him and stated, "That's my cell phone. That's the approved one." *Id.* at 1:01:08-1:01:15.

E.  The Federal Search Warrants Obtained as Part of the FBI's Investigation into Smurphat.

After the FBI became involved in the case, federal search warrants were obtained for the cellphone and for the online storage account. Def. Ex. E. The affidavit to search the cellphone included information about, and descriptions of, the child pornography located by the parole officers, as well as the admissions Smurphat had made to NYSP police. Def. Ex. E at 5-8. Omitting that information, however, the affidavit in support of the warrant nevertheless contained probable cause to search the cell phone. A copy of the affidavit without the challenged information is attached as Government's Exhibit 6.

The affidavit outlined the links between Smurphat and a KIK account used to upload child pornography that was reported in a CyberTipline Report from the National Center for Missing and Exploited Children (NCMEC). The affidavit stated that between September 20-30, 2020, 10 files reviewed by KIK and determined to constitute child pornography were uploaded by KIK user "nomorenightmaresx." *Id.* at 8-9. The affiant had reviewed all 10 files and provided the following descriptions for three video files: (1) a seven-to-eight-year-old is seen undressing, "touch[ing] her naked genitals[,] and expos[ing] her genitals which are visible in the recording"; (2) a four-to-five year old female is "anally and possibly vaginally penetrated by an adult male

penis" and is "subjected to intercourse in various positions throughout the video"; and (3) an adult hand can be seen touching and digitally penetrating a one year old infant "and later an adult penis attempts to penetrate the child's vagina." *Id*. at 8-9.  The affidavit then provided information linking Smurphat to the KIK account through two IP addresses used to access the account a month apart and from different locations.

Information obtained by the FBI from Charter Communications showed that the first IP address (67.248.158.184), which was utilized to upload the child pornography to the KIK account at the end of September 2020, was subscribed in another individual's name but returned to an address in Hudson Falls, New York, that matched the address listed on Smurphat's driver's license as of June 2021. *Id*. at 8-9.[1] Additionally, a law enforcement repository and vehicle registration records showed that an individual with the last name of "Smurphat," who the repository suggested was possibly Kevin Smurphat's brother, registered his vehicle to the residential address associated with that IP address.

A second IP address (66.67.116.55) was used to log onto the KIK account at the end of October 2020, a month after the child pornography had been uploaded, and returned as being subscribed in yet another individual's name at an address in Granville, New York.  *Id*. at 9-10. The residential addresses associated with the two IP addresses are approximately 20 miles apart. Driver's license information showed that the residential address in Granville matched the address listed on the driver's license for the individual previously identified as potentially being Smurphat's brother.

---

[1] The names and addresses were redacted from the warrants uploaded by the parties, Gov. Ex. 6 and Def. Ex. E, but unredacted copies were provided to Smurphat and can be made available to the Court if needed.

Approximately six weeks after the child pornography was uploaded to the KIK account and about two weeks after account had been accessed through the second IP address, the home visit occurred at Smurphat's residence in Whitehall, New York. As recounted in the warrant, Smurphat, who had been convicted of a sex offense involving minor under the age of 11 in December 2009, was visited at home by his parole officers on November 8, 2020, who located an internet capable cellphone that he was prohibited from possessing pursuant to his parole conditions. Gov. Ex. 6 at 4-5. Though the cellphone was found on a bed in Smurphat's residence, and he provided the passcode for it, he disclaimed ownership of the device. *Id.*

A subsequent warrant was obtained for a Dropbox account in which additional child pornography was located. Def. Ex. E at 35-48. The affidavit for that warrant also recited what was discovered during the searches of the cellphone by his parole officer and NYSP, but also included information learned pursuant to the federal warrant for the cellphone. A copy of the affidavit without the challenged information is attached as Government's Exhibit 7. Omitting that information, the warrant established that Smurphat, a convicted sex offender on supervision who had child pornography on an unauthorized cellphone (descriptions for which were included in the affidavit) had the Dropbox application on his cellphone and the associated account had 2.0 gigabytes of data in the online storage account. 5-6, 9-11.

Smurphat, indicted on charges for the child pornography located on the cellphone and in the online storage account, now seeks to suppress that child pornography and his incriminating admissions as the fruits of an unlawful parole search.

III.    **ARGUMENT**

    A.    <u>The Search of the Phone was Permissible Under the Conditions of Smurphat's Supervision.</u>

Whether as search pursuant to parole or supervised release conditions, the search of the cellphone was permissible under Fourth Amendment and Smurphat's arguments to the contrary are unavailing.  Starting with parole searches, Smurphat asserts that a suspicionless parole search was not permissible because, he claims, he was not on parole and, instead, under a form of state law supervision akin to federal supervised release.  Def. Br. at 6, 15.  In so arguing, Smurphat claims, that his "release from custody was <u>not</u> contingent on his agreement to abide by his release conditions. By itself, this distinguishes him from a parolee."  Def. Br. at 15 (emphasis added).  Smurphat's supervision documents and the Community Supervision Handbook on which he relies say otherwise.  While it is true, as Smurphat points out, that "the 'Board of Parole has no discretionary authority with regard to release on a determinate sentence,'" Def. Br. at 6 (quoting *N.Y. Community Supervision Handbook* at 4); *see also* NY Penal § 70.40(1)(ii), inmates subjected to determinate sentences remain eligible for "conditional release" *so long as they agree to abide by conditions*.  As the N.Y. Community Supervision Handbook explains things:

>  All inmates, except those serving Life sentences, have a conditional release date which is equal to either one-third (1/3) off their maximum sentence for indeterminate sentences and one-seventh (1/7) off their maximum sentence for determinate sentences. . .
>
> Conditional Release is a statutory type of release that the Board of Parole does not have discretion to grant or deny. The following conditions must be met in order to be eligible for Conditional Release:
>
> - An inmate must apply for conditional release; and
> - An inmate must agree in writing to abide by the conditions of community supervision until the expiration of their maximum term, or post-release supervision maximum expiration date.

*N.Y. Community Supervision Handbook* at 11.  Because inmates who obtain conditional release "must agree in writing to abide by the conditions of community supervision," this form of release bears the hallmark of parole. Def. Br. at 15; *Samson v. California*, 547 U.S. 843, 850 (2006) ("The essence of parole is release from prison, before the completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence").  Moreover, the "Conditions of Release" signed by Smurphat reflect that *his* form of release was contingent on an agreement to abide by conditions:

**Smurphat, Kevin C.,** now confined in **Franklin Correctional** Facility who was convicted and/or adjudicated of:

| CRIME/COUNTS | SENTENCE | COUNTY | COURT | SENTENCING DATE | JUDGE |
|---|---|---|---|---|---|
| Att: Sexual Abuse 1st | 0-0-0/3-0-0 | County | Essex | 06/10/10 | Meyer |

has agreed to abide by the conditions to which they have signed their name below, and is hereby granted release, by virtue of the authority conferred by New York State Law.

Def. Ex. A at 1.

Because Smurphat was a parolee, *Braggs* governs and establishes that suppression is not warranted here.  In *Braggs*, the Second Circuit held that a warrantless search by a DOCCS' officer lacking reasonable suspicion was permissible under the special needs doctrine where it was "reasonably related to the performance of the DOCCS officers' duties and therefore constitutionally permissible."  *United States v. Braggs*, 5 F.4th 183, 188 (2d Cir. 2021); *United States v. Elder*, 805 F. App'x 19, 21 (2d Cir. 2020) (unpublished) ("Suspicionless searches of a parolee do not violate the Fourth Amendment if the parolee has expressly consented to them.").  The circumstances of *Braggs* cannot be meaningfully distinguished from this case.  In *Braggs*, after receiving an anonymous tip that the defendants may have firearms at his house, parole officers went to his residence to search it in order to "ensure [his] compliance with his release conditions."  *Id*. at 185.  After they located firearms, drugs, and cash, the parole officers called the local police,

who arrived and obtained a post-*Miranda* statement in which Braggs incriminated himself. *Id*. Federal charges followed. *Id*. In finding that the search was reasonably related to the parole officer's duties, the Court observed, "Once [the parole officer] received notice of an anonymous tip suggesting that Braggs had guns in his possession—a clear violation of his parole conditions— he and his team were constitutionally permitted to search the house to determine whether Braggs was complying with the relevant condition."

*Braggs* fits this case hand in glove. Here, as in *Braggs*, the parole officers discovered Smurphat in possession of contraband in the form of an unauthorized cellphone[2]—a clear violation of Smurphat's conditions—and searched the device to determine whether he was complying with the relevant conditions, which, among other things, limited the number of devices Smurphat was permitted to have, required monitoring and imaging of his devices, prohibited circumvention of monitoring, required oversight of his online presence and social media usage, and prohibited him from possessing images of children and accessing pornography. *E.g.*, Def. Ex. A at 3; Def. Ex. D. at 2. In Smurphat's hands, the phone was contraband, and the parole officer was obligated to determine whether Smurphat was indeed using it and whether his use of that device was in contravention of the limitations on how he could use such devices. Ultimately, because the search of a contraband phone in possession of a sex offender subject to restrictions on such devices was

---

[2] That the parole officers in *Bragg* were informed of an anonymous tip before traveling to his residence to search it whereas the parole officers here were conducting a home visit is a distinction without a difference. Smurphat has not, and cannot, assert that they discovered the contraband phone in violation of the Fourth Amendment because unannounced home visits require no degree of suspicion, and the parole officers were lawfully in the place from which they discovered the phone. *United States v. Reyes*, 283 F.3d 446, 462 (2d Cir. 2002).

clearly related to the performance of the parole officer's duties, the search of the device was permissible as a parole search under *Braggs*.

But even if Smurphat's supervision could be characterized as fitting the supervised release mold, the search of the device was still permissible because it was supported by reasonable suspicion. *United States v. Knights*, 534 U.S. 112, 122 (2001) ("The warrantless search of Knights, supported by reasonable suspicion and authorized by a condition of probation, was reasonable within the meaning of the Fourth Amendment."). "The reasonable suspicion standard is not high" and "requires less than the 'fair probability' of wrongdoing needed to support probable cause, and it can arise from information that is less reliable." *United States v. Weaver*, 9 F.4th 129, 140 (2d Cir. 2021) (en banc) (internal quotation marks omitted). Courts "must view the totality of the circumstances through the eyes of a reasonable and cautious officer on the scene, whose insights are necessarily guided by the officer's experience and training, as well as commonsense judgments and inferences about human behavior." *Id*. (cleaned up).

Here, there was reasonable suspicion to search the phone to determine whether Smurphat had indeed possessed it in violation of the limitations on the number and type of devices he was permitted to possess without approval of his parole officer. If, as Smurphat asserts (Def. Br. at 9), cellphones have extensive, detailed information about their users, then there was ample reasonable suspicion to search the device—located in Smurphat's single-occupancy room and for which we provided the passcode prior to the search—to determine whether Smurphat had indeed accessed it in violation of his conditions. *Cf. Riley v. California*, 573 U.S. 373, 396 (2014) ("The average smart phone user has installed 33 apps, which together can form a revealing montage of the user's life."). Moreover, Smurphat was on supervision for a child sex offense and had repeatedly violated conditions tailored towards protecting children and concerning his possession and use of electronic

devices, including (1) for having contact with minors and possessing a computer with pornography on it in June 2010; (2) accessing the internet without authorization and possessing children's clothing in December 2012; and (3) having an unauthorized smartphone and children's underwear in January 2018.  Gov. Ex. 5 at 3.  Thus, the nature of his conviction and his prior violations contributed to reasonable suspicion not only that he had used the unauthorized cellphone, itself a violation, but that he used it in a manner contrary to his other conditions of release. *See United States v. Vonneida*, 601 F. App'x 38, 42 (2d Cir. 2015) (admission of the defendant's 24-yeard old conviction for violating NY Penal § 130.65(3)—the same provision Smurphat violated—was not an abuse of discretion under Federal Rule of Evidence 414, in part because [the defendant's] propensity to commit child molestation was probative of his intent that a minor engage in criminal sexual activity" where he was facing charges for possessing, producing, and transporting child pornography).  Thus, even if reasonable suspicion was required to search the device, that requirement was met in this case.

Ultimately, whatever the nature of Smurphat's supervision, the search of the device was permissible under the Fourth Amendment and his motion should be denied on that basis.

B. <u>Smurphat Abandoned any Privacy Interest in the Phone When he Disclaimed Ownership of it Immediately Before his Parole Officer Searched it.</u>

Smurphat's motion should also be denied because he abandoned his interest in the phone when he told his parole officers it did not belong to him.  "The fourth amendment's protections . . . do not extend to abandoned property" *United States v. Lee*, 916 F.2d 814, 818 (2d Cir. 1990). "In determining whether there has been an abandonment, the district court must focus on the intent of the person who is purported to have abandoned the property." *Id*.  "Intent may be inferred from words spoken, acts done, and other objective facts." *Id*. (internal brackets and citations omitted). In *Lee*, the defendant had been repeatedly observed with a maroon luggage piece as he moved

through an airport before departing from Buffalo, New York, to Tampa, Florida. *Id*. at 816. Upon his return, while walking towards the baggage claim area and exit for the terminal without the maroon suitcase in tow, investigators approached and began to ask questions. *Id*. at 816-817. The defendant claimed three times to be traveling without any additional luggage. *Id*. at 817. Thereafter, investigators located the maroon luggage he had been seen with before his departure and upon inspection by an airline worker discovered it contained cocaine. *Id*.

Here, Smurphat abandoned any privacy interest in the cellphone when he disclaimed ownership of it to his parole officer. Def. Ex. B; Gov. Ex. 5 at 6. That it may have been apparent to the parole officers that the cellphone was Smurphat's is inapposite because the same would have been true in *Lee* where the officers had observed the defendant. *Lee*, 916 F.2d 818; *see also United States v. Springer*, 946 F.2d 1012, 1014 (2d Cir. 1991) (finding defendant abandoned luggage piece he was carrying at the time he was encountered by law enforcement when claimed that he had grabbed the wrong suitcase and did not object to it being searched because he claimed it did not belong to him). What matters is that Smurphat disclaimed ownership of the device, so he had no expectation of privacy in it at the time it was searched by his parole officers. *Lee*, 916 F.2d 818; *Springer*, 946 F.2d at 1014. Accordingly, the search of the phone by his parole officer after Smurphat abandoned it was permissible under the Fourth Amendment.

C. <u>Smurphat Consented to the Search of the Phone.</u>

Smurphat also consented to the search of his phone at NYSP barracks. "The government has the burden of proving, by a preponderance of the evidence, that a consent to search was voluntary." *United States v. Isiofia*, 370 F.3d 226, 230 (2d Cir. 2004). "Voluntariness is a question of fact determined by a totality of all the circumstances." *Id.* at 231. Here, although Smurphat initially declined to provide the passcode for the phone, he later consented to its search after Inv.

Reppenhagen explained that it would present better to the district attorney's office and the court if Smurphat was cooperative, that he had already given authorization through his parole conditions to review it, and that the investigators could get a warrant, but that Smurphat's consent would spare them from having to do so. Id. at 15:50-16:45.  Inv. Reppenhagen also read a consent to search form to Smurphat and explained the process that would be followed to review the phone. Id. at 27:45-29:10. On Smurphat's prompting, Inv. Reppenhagen, read out loud from the form a portion initially missed that provided, "I fully understand that I don't have to consent to the search. No promises threats or intimidation were used." Id. at 30:00-31:20.  While appearing to sign the form, Smurphat said, "So, you've already seen it so I know you can charge me today. And you're choosing not to?" to which Inv. Reppenhagen responded, "No." Smurphat then stated, "I appreciate that. I do," and Inv. Reppenhagen responded, "Well I appreciate you being cooperative, you know. It goes a long way."   Id. at 31:20-31:36.  Given the cordial nature of the interactions between Inv. Reppenhagen and Smurphat and that Smurphat was informed that he did not have provide consent to search before signing the form, Smurphat's consent was not the product of coercion. *United States v. Oguns*, 921 F.2d 442 (2d Cir. 1990); *United States v. Yu-Leung*, 51 F.3d 1116, 1119 (2d Cir. 1995).

Furthermore, Smurphat's consent to search was not tainted by any alleged unlawful search by his parole officers. "The question of whether a statement has been purged of such a taint does not hinge on a simple 'but for' analysis, but rather, must be answered on the facts of each case." *United States v. Thompson*, 35 F.3d 100, 105 (2d Cir. 1994).  "Relevant factors include whether a Miranda warning has been given and waiver obtained, the temporal proximity of the illegal seizure and the contested statement, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct."  Here, Smurphat was provided his *Miranda* warnings,

acknowledged he understood them, and continued to speak to Inv. Reppenhagen. While the temporal proximity of the consent to the allegedly invalid parole search was narrow and no significant intervening circumstances had occurred, that search, conducted pursuant to the conditions of Smurphat's supervision, cannot be called flagrant.

    D. <u>The Federal Search Warrant for the Phone Provided an Independent Source Justifying its Search.</u>

Even if the search of Smurphat's phone was not permissible as a parole search, he did not abandon the device, and his provision of consent was invalid, the search of the cellphone was still permissible pursuant to the federal warrant obtained for it.[3] "When an application for a search warrant includes both tainted and untainted evidence, the warrant may be upheld if the untainted evidence, standing alone, establishes probable cause." *Laaman v. United States*, 973 F.2d 107, 115 (2d Cir. 1992). Here, there were sufficient facts establishing probable cause given that (1) the IP addresses used to access the KIK account that had uploaded child pornography were linked to addresses associated with Smurphat (including one bearing the same residential address listed on his license as of June 2021 and one linked to an individual with a last name of Smurphat and believed to be his brother); (2) Smurphat had a demonstrated sexual interest in children given his prior conviction for attempting to fondle a seven-year-old girl; (3) a parole visit six weeks after the child pornography had been uploaded and two weeks after the KIK account had last been

---

[3] For the sake of argument, the government has assumed a worst-case scenario in which the search of the phone by the parole officers and the NYSP are both tainted. If, however, the Court determines that the search of the phone by the parole officers or NYSP was constitutionally permissible for any of the reasons articulated by the government, the inclusion in the warrant of the evidence learned from the phone would clearly establish probable cause supporting the warrant, especially given the observations of child pornography on the device by both the parole officers and the NSYP.

accessed yielded an unauthorized smartphone that Smurphat attempted to distance himself from by disclaiming ownership of it.   Even without information about what had been located on the cellphone by parole and NYSP, there was sufficient probable cause justifying the issuance of the warrant.  *Cf.  Vonneida*, 601 F. App'x 38, 42 (2d Cir. 2015) (prior conviction under NY Penal § 130.65 admissible as propensity evidence for child pornography offenses); *United States v. Raymonda*, 780 F.3d 105, 114 (2d Cir. 2015)("Because it is well known that images of child pornography are likely to be hoarded by persons interested in those materials in the privacy of their homes, evidence that such persons possessed child pornography in the past supports a reasonable inference that they retain those images—or have obtained new ones—in the present."). Alternatively, even if the facts above did not amount to probable cause, the warrant cannot be said to have been "so lacking in indicia of probable cause as to render reliance upon it unreasonable," nor is there any other basis for not finding that law enforcement relied on it in good faith. *Raymonda*, 780 F.3d at 118.

E.  <u>Application of the Exclusionary Rule is Not Warranted in This Case.</u>

The exclusionary rule is a judicially created remedy that, "when applicable, forbids the use of improperly obtained evidence at trial." *Herring v. United States*, 555 U.S. 135, 139, (2009). The Supreme Court has "repeatedly rejected the argument that exclusion is a necessary consequence of a Fourth Amendment violation." *Id*. at 141.  Instead, the exclusionary rule "applies only where it 'result[s] in appreciable deterrence,'" and where the benefits of deterrence outweigh the costs.  *Id*. (quoting *United States v. Leon*, 468 U.S. 897, 909 (1984)) (internal citations omitted). In the context of probation searches, the Second Circuit has declined to apply the exclusionary rule where the search "was rationally and reasonably related to the performance of [the probation officer's] duty." *United States v. Elder*, 805 F. App'x 19, 23 (2d Cir. 2020) (unpublished), *cert.*

*denied*, 141 S. Ct. 1055 (2021).   In *Elder*, probation officers and DEA agents searched a supervisee's residence based on DEA's receipt of "four anonymous emails over the course of two months alleging that Elder was selling drugs from his home."  *Id*. at 21.  Assuming the search to be unsupported by reasonable suspicion, the Second Circuit declined to exclude the evidence, reasoning that the "incremental deterrent of excluding the evidence found . . . against the substantial social costs extracted by the exclusionary rule."  *Id*. at 23.

Here, parole officers conducted a home visit and located a contraband phone which they searched pursuant to the conditions Smurphat had agreed to abide by upon his release.  Thereafter, after providing *Miranda* warnings to Smurphat, NYSP sought and obtained Smurphat's written consent to search the device after informing him that he did not have provide consent to search. Finally, federal law enforcement officers searched the device only after obtaining a federal warrant for it, which lead them to search an online storage account, also pursuant to a warrant. Given the reasonableness of the steps taken by the parole officers, NYSP, and FBI, application of the exclusionary rule is not warranted in this case.  Accordingly, even assuming a violation of Smurphat's Fourth Amendment rights occurred, the evidence against him should not be excluded.

## F.  CONCLUSION

For the foregoing reasons, the Court should deny Smurphat's Motion to Suppress.  Given that Smurphat did not request an evidentiary hearing and the absence of any significant factual disputes, the government does not  request a hearing.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

*******************************************

UNITED STATES OF AMERICA,

Case No.:    1:22-CR-69 (GLS)

v.

KEVIN SMURPHAT,

Defendant.

*******************************************

## CERTIFICATE OF SERVICE

I hereby certify that on December 16, 2022 the foregoing was electronically filed with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to the counsel of record for the defendant.

_ */s/ Dustin C. Segovia*  _
Dustin C. Segovia
Assistant U.S. Attorney
Bar roll No. 703016